IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MOHAMED A. EL-TABECH,  ) | |
| ) | 4:04cv3231 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| HAROLD W. CLARKE, et al., ) | |
| ) | |
| Defendant. ) | |
| ) | |

      This matter is before the court on plaintiff Mohamed A. El-Tabech's ("El-Tabech") motions for partial summary judgment, Filing Nos. 145, 150, and joint stipulation of facts, Filing No. 149.  El-Tabech was born and raised in Beirut, Lebanon, where he resided until he was approximately twenty-five years old.  El-Tabech alleges that he was born into, and has remained a sincere adherent to the Orthodox Muslim faith.  Filing No. 110.  On May 20, 1983, El-Tabech came to the United States on a visitor's visa and on August 14, 1983, he was baptized into the Church of Jesus Christ of Latter Day Saints, also known as the Mormon religion.[1]  Filing No. 148, Attachment 1 ("Exhibit 2").  Before his visa expired, El-Tabech filed for political asylum.  El-Tabech then married Lynn El-Tabech and withdrew his application and filed for classification status as being married to an American citizen.[2]

---

      [1]In early 2007, El-Tabech requested removal from the member list of the Mormon church.  Filing No. 149.

      [2]El-Tabech never acted on this petition and his wife later filed a petition to classify status for an alien relative.  This petition was never processed due to El-Tabech's subsequent arrest.

On June 24, 1984, El-Tabech's wife, Lynn El-Tabech, was murdered. On that date, medical responders arrived at the El-Tabech home in Lincoln, Nebraska, and found Lynn El-Tabech "lying on a bed with a white terry cloth bathrobe belt tied tightly around her neck." *State v. El-Tabech*, 405 N.W.2d 585, 588 (Neb. 1987). A jury later convicted El-Tabech of first-degree murder and use of a deadly weapon to commit a felony. *Id.*; *El-Tabech v. Hopkins*, 997 F.2d 386, 387 (8th Cir. 1993). The trial court sentenced El-Tabech to consecutive terms of life imprisonment for the murder and twenty years for use of a deadly weapon. *Id.*

Following his sentencing in 1985, El-Tabech was remanded to the custody of the Nebraska Department of Correctional Services ("NDCS") where he has since remained. While El-Tabech was incarcerated at the Nebraska State Penitentiary ("NSP"), a maximum security prison, our protagonist engaged in two escape attempts. First, NSP placed El-Tabech on administrative confinement after prison officials found him and another inmate crawling along the NSP fenceline in an attempt to escape on October 28, 1995. Filing No. 158; Filing No. 148, Attachment 1 ("Exhibit 4"). Then, on April 15, 2001, El-Tabech and three other inmates attempted an escape that involved hostages and weapons.[3] Consequently, NSP officials transferred El-Tabech to the Control Unit ("CU") at NSP, a segregation unit.

On July 18, 2002, El-Tabech was transferred to the Tecumseh State Correctional Institution ("TSCI") where he is currently incarcerated. Upon his transfer to TSCI, prison

---

[3] El-Tabech maintains that he did not possess any knives during the April 25, 2001, escape attempt, although a report of the incident includes a statement that "[a]ll inmates participating in the escape attempt were reported to be in possession of weapons (knives). One hostage was assaulted with a knife, and received treatment from NSP medical personnel." Filing No. 148, Attachment 1 ("Exhibit 4").

2

officials placed El-Tabech in the Special Management Unit ("SMU"), a segregation unit, and placed him on Intensive Management ("IM") status. IM involves "removal of an inmate from general population for an indefinite period of time to maintain order and security within the institution." Filing No. 148, Attachment 4 ("Exhibit 30"). IM status, a type of administrative segregation, is defined as the "confinement of an inmate when the inmate's demonstrated behavior presents a high risk of physical danger to anyone with whom the inmate comes into contact." *Id.*

IM status minimizes the contract between inmates and other inmates and staff. Francis Britten Dep. 62:8-17. Inmates receive an hour in the yard five days a week as well as three showers a week; they are fed in their cells; and inmates have access to telephone calls and the law library. *Id.* 64:15-20. Those inmates on IM status are housed in cells where they shower, live, and exercise in the same area, as opposed to inmates on administrative confinement who are afforded more freedom to access galleries to the exercise yard and the showers because such areas are not attached to their cells. *Id.* 65:1-25. Cells are illuminated by a regular light that can be controlled by the inmate, and there is a night-light that remains on at all times and cannot be turned off by the inmate. *Id.* 283:12-24. Inmates on IM status are not permitted to attend religious services, but they are able to communicate with religious coordinators by request, and inmates may obtain religious materials to listen to in their living areas. *Id.* 208:11-25.

According to the Administrative Regulations of Department of Correctional Services for the State of Nebraska, a "Unit Classification Committee" conducts reviews of an inmate's continuation on Administrative Segregation every six months. Filing No. 148, Attachment 4 ("Exhibit 30"). The "Institutional Classification Committee" then reviews and

3

refers all classification recommendations from the Unit Classification Committee to the Facility Administrator, who, in turn, approves assignments, continuations or removals.  *Id.*  The Facility Administrator also approves all reports of weekly and bimonthly reviews conducted on inmates on Administrative Segregation.  *Id.*  An inmate must appeal the Facility Administrator's decision within fifteen calendar days of the receipt of the decision.  *Id.*  The Administrative Segregation Review Board hears inmates' appeals from the Facility Administrator's decisions, and the Director's Review Committee finalizes the approval of assignment, continuation, or removal from IM status and "Transition Confinement" status.  *Id.*

The Unit Classification Committee conducts formal reviews of each Administrative Segregation inmate every two weeks after sixty continuous days of segregation, and inmates receive notice of the Segregation Status Review and have an opportunity to appear before the Unit Classification Committee once a month.  *Id.*  Inmates must receive written notice of a classification hearing on an inmate's placement, continuation, or removal from administrative segregation at least forty-eight hours prior to the hearing.  *Id.*  An inmate may request a continuance of the hearing by making a written request for additional time to prepare a response.  *Id.*  The Unit Classification Committee conducts the hearing, and the inmate has the opportunity to refute the information and present and submit any pertinent information.  *Id.*  The Unit Classification Committee makes a written record of the Segregation Status Review that is submitted to the Facility Administrator.  *Id.*  The Facility Administrator reviews the record and either approves it or returns it for further action.

El-Tabech maintains that he has been classified as IM status since March 22, 2002, and that this status prohibits him from interacting with other inmates and only permits him

three showers per week unless he earns a fourth shower pursuant to the incentive program.  Filing No. 148, Attachment 2 ("Exhibit 28 " - El-Tabech Affidavit).  According to El-Tabech, IM status also precludes him from job and educational opportunities, and he is denied attendance at religious services.  *Id.*  El-Tabech alleges that he has attended Unit Classification Committee reviews of his IM status, but he has never been permitted to call witnesses or present evidence.  *Id.*  El-Tabech contends that although he is not eligible for parole, IM status interferes with his parole eligibility because IM status inmates cannot engage in job and educational opportunities.  Filing No. 146.

El-Tabech brought suit in this court against the following defendants: Harold Clarke ("Clarke"), NDCS Director; Robert P. Houston ("Houston"), NDCS Director; Frank Hopkins ("Hopkins"), NDCS Assistant Director; Mike Kenney, NSP Warden; Francis Britten ("Britten"), TSCI Warden; Randy Cole ("Cole"), NDCS Medical Director; Douglas Sell ("Sell"), head of the Mental Health program at TSCI; Mary Carmichael ("Carmichael"), TSCI Contract Monitor; Steve Vodicka ("Vodicka") TSCI and NSP Safety/Sanitations Coordinator.  Filing No. 110.  El-Tabech sued these defendants in their official capacity as it relates to his request for injunctive relief, and in their individual capacities as it relates to El-Tabech's request for monetary damages.

In his amended complaint, El-Tabech alleges that defendants Clarke, Houston, Hopkins, Britten, and Carmichael violated the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (42 U.S.C. § 2000cc *et seq.*) (Claim I); defendants Clarke, Houston, Hopkins, Britten, and Carmichael violated El-Tabech's right to free exercise of religion under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983) (Claim II); all defendants violated El-Tabech's right to be free from cruel

5

and unusual punishment in accordance with the Eighth and Fourteenth Amendments (42 U.S.C. § 1983) (Claim III);[4] and defendants Clarke, Houston, Kenney, Hopkins, Britten, and Sell violated El-Tabech's procedural due process rights under the Fourteenth Amendment (42 U.S.C. § 1983) (Claim IV). Filing No. 110.

El-Tabech requests that this court declare the actions of the defendants unlawful and violative of El-Tabech's Constitutional rights, issue a preliminary and permanent injunction requiring defendants to provide El-Tabech with a nutritionally sufficient kosher diet, find that failure to provide El-Tabech with a kosher diet and the opportunity to shower daily violates his rights under RLUIPA, enjoin defendants from subjecting El-Tabech to the conditions of confinement as alleged in his amended complaint, award El-Tabech compensatory and general damages, grant El-Tabech attorney fees and costs in accordance with 42 U.S.C. § 1988, and grant any other relief the court deems appropriate. Filing No. 110.

Now before the court are El-Tabech's motions for summary judgment on his fourth, first, and second claims, respectively, his allegations of violations of procedural due process, RLUIPA, and the First and Fourteenth Amendments' right to the free exercise of religion. Filing Nos. 145, 150. The defendants oppose El-Tabech's motions and have filed briefs to support their position. The court has reviewed the evidence and briefs in this case and finds that summary judgment is not appropriate as set forth below.

---

[4]The third claim of cruel and unusual punishment is dismissed in accordance with the pretrial order. Filing No. 165, ¶ (C)(6).

**Legal Standards**

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).

The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Therefore, if defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence. *Adickes*, 398 U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational Inc.*, 825 F.2d 167, 173 (8th Cir. 1987).

Once a party meets its initial burden of showing there is no genuine issue of material fact, the opposing party may not rest upon the allegations of his or her pleadings but rather must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(e); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998). The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts; he or she must show "there is sufficient evidence to support a jury verdict" in his or her favor. *Id.* Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While courts evaluate facts in the light most favorable to the nonmoving party, "in order to defeat a motion for summary judgment, the non-moving party cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." *Carter v. St. Louis Univ.*, 167 F.3d 398, 401 (8th Cir. 1999). In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir. 2003).

**Claim I - Due Process**[5]

The Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. There are two steps essential to a procedural due process inquiry. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). The first question is whether a property or liberty interest deprivation has occurred. *Senty-Haugen*, 462 F.3d at 886. Protected liberty interests arise from both the Due Process Clause itself and state laws. *Id.* at 886. If a protected interest exists, the second step of the procedural due process analysis requires a balancing of the private interest at stake, the risk of erroneous deprivation of such interest, and the governmental interests involved. *Morgan v. Rabun*, 128 F.3d 694, 699 (8th Cir. 1997); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

---

[5]In his amended complaint, El-Tabech captioned his fourth claim as a procedural due process claim. The court finds that the parties' arguments implicate both procedural and substantive due process concerns. Thus, the court will address the due process argument in its entirety.

8

The Due Process Clause by itself does not accord a prisoner a liberty interest in remaining in the general population. *Lekas v. Briley*, 405 F.3d 602, 607 (7th Cir. 2005). Rather, prison officials must receive "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Accordingly, the Eighth Circuit has held that an inmate "does not have a constitutional right to a particular prison job or classification." *Sanders v. Norris*, 153 Fed. Appx. 403, 404 (8th Cir. 2005); *Hartsfield v. Dep't of Corr.*, 107 Fed. Appx. 695, 696 (8th Cir. 2004) (unpublished opinion per curiam) (inmate has "no liberty interest in a particular classification."). Thus, the question remains whether a liberty interest exists created by state law.

To demonstrate a liberty interest created by state law, "[a]n inmate who makes a due process challenge to his segregated confinement must make a threshold showing that the deprivation of which he complains imposed an atypical and significant hardship." *Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002) (internal quotations omitted); *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Eighth Circuit Court of Appeals has consistently held that "administrative and disciplinary segregation are not atypical and significant hardships[.]" *Portley-El*, 288 F.3d at 1065; *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship."). The absence of contact visitation, exercise privileges, and chapel rights do not necessarily constitute an atypical and significant hardship. *Phillips*, 320 F.3d at 847.

9

El-Tabech maintains that he has been on IM status for nearly six years, he has no history of violence while on IM status, and he has no hope of ever being promoted beyond IM status. According to El-Tabech, he has received his six-month hearings, but they amount to nothing more than "an opportunity to make the same statement to the same group of prison employees." Filing No. 146. El-Tabech argues that the length and indefiniteness of IM status constitute an atypical and significant deprivation of liberty that requires due process of law. In support of his argument, El-Tabech contends that in *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court determined that prisoners had a liberty interest in avoiding assignment to OSP, a maximum security facility in Ohio with highly restrictive conditions designed to segregate the most dangerous prisoners from the general prison population. Incarceration in OSP was "synonymous with extreme isolation" and inmates were deprived "of almost any environmental or sensory stimuli and of almost all human contact." Further, inmates were placed in OSP for an indefinite period of time, reviewed annually after an initial 30-day review, and those inmates eligible for parole lost their eligibility while incarcerated at OSP. The court concluded that these conditions alone may be insufficient to create a liberty interest, but in the aggregate they imposed "an atypical and significant hardship within the correctional context." *Wilkinson*, 545 U.S. at 224.

The defendants argue that El-Tabech does not have a protected liberty interest in a specific classification, or rather, freedom from a restrictive classification status. When considering whether the conditions, duration or restrictions of confinement are atypical as compared with other inmates, admittedly, few cases involve comparisons of IM status lasting almost six years. However, under *Sandin*, a liberty interest determination is to be

made based on whether it will affect the overall duration of the inmate's sentence. *Sandin*, 515 U.S. at 484; *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998). Here, there is no evidence that IM status will impact El-Tabech's consecutive life sentences because El-Tabech is not eligible for parole. El-Tabech maintains that while he is not currently eligible for parole, he could become eligible for parole if the Nebraska Governor were to commute his sentence. However, Nebraska law does not create a liberty interest in the possibility of commutation, other than the right to file an application for commutation. *Otey v. Stenberg*, 34 F.3d 635, 637 (8th Cir. 1994) (*citing Otey v. State*, 485 N.W.2d 153, 166 (Neb. 1992)); *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 467 (1981) ("the mere existence of a power to commute a lawfully imposed sentence, and the granting of commutations to many petitioners, create no right or 'entitlement.'"); *see also Adams v. Agniel*, 405 F.3d 643, 645 (8th Cir. 2005) (*citing Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 11 (1979)) (an inmate does not have a constitutionally-protected liberty interest in the possibility of parole). Thus, the court finds that the loss of an opportunity to engage in rehabilitative activities requisite for potential commutation is a speculative, collateral consequence of administrative segregation insufficient to create a liberty interest. *See also Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir. 1996) (placement in administrative segregation does not constitute a deprivation of a constitutionally cognizable liberty interest).

Additionally, in a similar case, inmate Troy Anthony Hess ("Hess") was placed on IM status at Tecumseh State Correctional Institution after an incident where he assaulted prison officials and an attempted escape incident involving hostages and weapons. *Hess v. Clarke, et al.*, 4:03cv3110 (D. Neb. 2005) (unpublished). Hess spent eleven and one-

half years on IM status and brought suit alleging violations of among other claims, due process. *Id.* The court determined that Hess' segregated confinement did not constitute an atypical and significant hardship and, therefore, Hess' due process claim failed. *Id.* The court further stated that even if Hess had proved an atypical and significant hardship, Hess would still not succeed on his procedural due process claim because Hess received all the due process to which he was entitled. Specifically, the court noted that "an informal, non-adversary evidentiary proceeding was sufficient to support a finding that a prisoner posed a security threat and to support a decision to confine a prisoner to administrative segregation." *Id.*

This court agrees with this analysis and finds that under the facts of this case, El-Tabech does not have a protected liberty interest sufficient to warrant a due process claim. Even if this court found that El-Tabech had made the requisite showing that his extended time in IM status constituted an atypical and significant hardship sufficient to warrant a protected liberty interest, El-Tabech still would not succeed with his procedural due process claim because defendants afforded El-Tabech adequate procedural protections to justify its placement decisions. Like the inmate Hess, El-Tabech has received hearings every six months to review his status. El-Tabech argues that the *Mathews* factors[6] support

---

[6]The *Mathews* court considered three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

a finding that El-Tabech received inadequate procedure under the Constitution. However, the Supreme Court in *Wilkinson* evaluated the traditional analysis governing procedural due process and found that "a relaxed set of procedures satisfied an inmate's challenge to a placement decision or conditions of confinement." *Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1344 (10th Cir. 2007); *Wilkinson*, 545 U.S. at 228-29. Thus, in the inmate segregation context, due process is satisfied if the state permits "(1) a sufficient initial level of process, *i.e.*, a reasoned examination of the assignment; (2) the opportunity for the inmate to receive notice and respond to the decision; and (3) safety and security concerns to be weighed as part of the placement decision." *Estate of DiMarco*, 473 F.3d at 1344 (*citing Wilkinson*, 545 U.S. at 226-27).

There is no evidence to suggest that El-Tabech did not receive notice of his IM status hearings or an opportunity to participate as El-Tabech states that he has attended his status review hearings. El-Tabech alleges that at his hearings he has only been allowed to make simple, brief statements which "seem to have no bearing whatsoever on the review committee." Filing No. 146. However, like the court in *Hess* noted, the guarantees of due process are flexible and can vary given the situation. *Hess v. Clarke, et. al.*, 4:03cv3110 (D. Neb. 2005) (unpublished); *Hewitt v. Helms*, 459 U.S. 460, 472 (1983). Prison officials are "obligated to engage only in an informal, non-adversary review of the information supporting . . . administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation." *Hewitt*, 459 U.S. at 472. Provided these minimal due process requirements are met, an inmate's transfer from a restricted environment to a more confined environment is "not one of great consequence" when weighed against the state's interest

in preserving order and maintaining institutional security. *Id.* at 473. Therefore, the court finds that El-Tabech has received all the procedural due process rights to which he is entitled, and summary judgment must be denied.

The purpose behind Rule 56 is to promptly dispose of actions in which there are no genuine issues of material fact. Fed. R. Civ. Pro. 56 advisory committee's notes. "In order to achieve this goal, the rule thus requires a court, under the proper conditions, to grant the relief to which a party is entitled even if the party has not demanded such relief." *Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 786 (5th Cir. 1997). "District courts are widely acknowledged to possess the power to enter summary judgment sua sponte." *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114 (2d Cir. 1999). A court may grant summary judgment in favor of the nonmoving party provided the party has had a "full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." *First Fin. Ins. Co.*, 193 F.3d at 115. Having found that El-Tabech had the opportunity to fully present the evidence of his due process claim, the court finds that summary judgment is appropriate in favor of defendants and this claim will not proceed to trial.

**Claims I and II - RLUIPA and Free Exercise of Religion (First and Fourteenth Amendments)**

El-Tabech next claims that there is no genuine issue of material fact that defendants Clarke, Houston, Hopkins, Britten, and Carmichael violated El-Tabech's rights under Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, and the First and Fourteenth Amendments. Filing No. 150. Although incarcerated, inmates retain First Amendment protections, including the right that no law shall prohibit

the free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Courts evaluating a First Amendment claim must first consider whether the challenged governmental action infringes upon a sincerely held religious belief. *Murphy*, 372 F.3d at 983. Then, the court must apply the *Turner* factors, a reasonableness test "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). The *Turner* factors are: "(1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether alternative means for exercising the right remain open to the prisoner; (3) the impact of the regulation on prison staff, other inmates, and the allocation of prison resources; and (4) the availability of ready alternatives to the regulation." *Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996); *Turner*, 482 U.S. at 89-91.

Courts employ the rational basis test to prisoners' First Amendment claims brought by prisoners, but Congress has established a higher level of scrutiny for free exercise claims brought under RLUIPA: Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person" furthers a compelling government interest and is the least restrictive means to compel that interest. 42 U.S.C. § 2000cc-1(a).

15

RLUIPA protects inmates who, because they are incarcerated, are unable to freely exercise their religion and therefore rely on the government's permission and accommodation to pursue their religious rights. *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). A government regulation is a substantial burden when it significantly inhibits or constrains conduct or expression that manifests some central tenet of a person's individual religious beliefs, meaningfully curtails a person's ability to express adherence to a faith, or denies a person reasonable opportunities to engage in religious activities cardinal to a person's religion. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (brackets and citation omitted). While employing the strict scrutiny standard, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722. Indeed, those who enacted RLUIPA were "mindful of the urgency of discipline, order, safety, and security in penal institutions." *Id.* at 723. Courts must "[a]ccord great deference to the judgment and expertise of prison officials, 'particularly with respect to decisions that implicate institutional security.'" *Murphy*, 372 F.3d at 983 (*quoting Goff v. Graves*, 362 F.3d 543, 549 (8th Cir. 2004)).

In support of his claims, El-Tabech argues that his religion requires that he adhere to a Halal diet: eating only permitted kosher food including certain animals but only if slaughtered properly and blessed; separating dairy from meat; separating kosher from non-kosher items; and maintaining the cleanliness of utensils, plates, glassware, and trays. El-Tabech further maintains that his religion requires a degree of cleanliness, like daily showers, that is currently not being afforded to him while on IM status. El-Tabech also alleges that defendants have burdened El-Tabech's beliefs regarding prayers and prayer times. El-Tabech claims his religious beliefs are sincerely held and that defendants cannot

advance a compelling state interest to justify not accommodating El-Tabech's religious requests.

The defendants however, allege that El-Tabech's religious beliefs are not substantially burdened. According to defendants, the prison's inability to accommodate El-Tabech's requests stems from the prison's interest in maintaining safety and security. Defendants claim El-Tabech's requests are not "reasonable accommodations" and cite security and cost concerns as reasons for not fulfilling El-Tabech's requests. Further, defendants question the sincerity of El-Tabech's religious beliefs due to his affiliations with both the Mormon church and the Orthodox Muslim religion.

The court has reviewed the record and evidence as it relates to El-Tabech's alleged violations of RLUIPA and the First and Fourteenth Amendments, and the court finds that summary judgment is not warranted. Specifically, the court finds that genuine issues of material fact exist concerning the allegations of cost and security in affording El-Tabech a kosher diet. The parties disagree over the cost and feasability of options to accommodate El-Tabech's kosher requirements, namely, pre-packaged kosher meals, El-Tabech's ability to purchase kosher items through the canteen, and the establishment of a separate, kosher kitchen at TSCI. At further issue is whether additional showers or adherence to a prayer schedule risk additional cost, time, and staff, and ultimately, security concerns to the prison facility that would constitute a compelling state interest. As such, summary judgment is denied and El-Tabech's first and second claims regarding religion remain subject to further inquiry at trial.

THEREFORE, IT IS ORDERED that

1. Plaintiff El-Tabech's motions for partial summary judgment, Filing Nos. 145 and 150, are denied;

2. Summary judgment is granted in favor of the defendants on Claim IV, El-Tabech's Due Process Claim, as set forth herein;

3. Trial will proceed on the remaining claims of the amended complaint, Claims I and II, pursuant to the terms of the pretrial order; and

4. The court takes notice of the joint stipulation of facts, Filing No. 149.

DATED this 18th day of May, 2007.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge