IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MOHAMED A. EL-TABECH, | ) | |
| | ) | 4:04cv3231 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| HAROLD W. CLARKE, et al., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court following a non-jury trial. Plaintiff filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging that defendants violated his rights under RLUIPA, and the Eighth, First, and Fourteenth Amendments. Based on the evidence and testimony presented to the court in this case and pursuant to Federal Rule of Civil Procedure 52, the court makes the following findings of fact and conclusions of law.

**Findings of Fact**

El-Tabech was born and raised in Beirut, Lebanon, where he was raised in the Orthodox Muslim faith. El-Tabech was baptized into the Church of Jesus Christ of Latter Day Saints, also known as the Mormon religion, on August 14, 1983. According to El-Tabech, he was baptized due to pressure from Mormon friends who helped him establish a residence, a job, and educational opportunities. In early 2007, El-Tabech requested removal from the member list of the Mormon church.

Since July 18, 2002, El-Tabech has been continuously incarcerated at the Tecumseh State Correctional Institution ("TSCI"), where he is serving consecutive terms of life imprisonment plus twenty years. At TSCI, prison officials placed El-Tabech in the Special Management Unit ("SMU"), a segregation unit, and placed him on Intensive

Management ("IM") status. El-Tabech was placed on IM status because while at Nebraska State Penitentiary ("NSP"), a maximum security prison, El-Tabech engaged in two escape attempts, one of which involved hostages and weapons. *See* Exhibit No. 25. El-Tabech is no longer on IM status; he is now on administrative confinement ("AC").

IM involves "removal of an inmate from general population for an indefinite period of time to maintain order and security within the institution." Exhibit No. 50. IM status, a type of administrative segregation, is defined as the "confinement of an inmate when the inmate's demonstrated behavior presents a high risk of physical danger to anyone with whom the inmate comes into contact." *Id*. AC is the "confinement of an inmate to maintain the safety, security and good order of the institution." *Id*.

As part of El-Tabech's religious beliefs, he believes that he must maintain a kosher diet. Further, El-Tabech believes that he must maintain the utmost level of physical cleanliness and purity in his daily life, including daily showers. El-Tabech must also adhere to a prayer schedule. The Nebraska Department of Correctional Services ("NDCS") does not provide a kosher food option to any of the inmates at any of its facilities. NDCS requires that all facilities provide adequate support for inmates whose religious beliefs require adherence to special dietary beliefs. Any inmate may abstain from eating religiously prohibited foods without jeopardizing the nutritional adequacy of the diet. Prisoners are able to purchase items through the canteen, but it is not possible to know what foods are kosher before ordering.

Prisoners on IM status receive three showers per week, although El-Tabech has earned a fourth shower per week through TSCI's incentive program. On days in which he is not permitted to shower, Mohamed believes he exists in an impure state, a state in which

he remains until he is able to cleanse his "whole body" in accordance with his sincerely-held beliefs based on the Holy Qu'ran.

Two of El-Tabech's claims proceeded to trial, pursuant to the court's previous memorandum and order. Filing No. 172. In his amended complaint, El-Tabech alleges that defendants Clarke, Houston, Hopkins, Britten, and Carmichael violated his rights under Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (42 U.S.C. § 2000cc *et seq.*) (Claim I), and that the same defendants violated El-Tabech's right to free exercise of religion under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983) (Claim II). Filing No. 110.

**Conclusions of Law**

The First Amendment provides that no law shall prohibit the free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). A prison regulation is valid, even if it restricts an inmate's constitutional rights if it is "reasonably related to legitimate penological interests." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004) (*quoting Turner v. Safley*, 482 U.S. 78, 89 (1987)). Courts evaluating a First Amendment claim must first consider whether the challenged governmental action infringes upon a sincerely-held religious belief. *Murphy*, 372 F.3d at 983. Then, the court must apply the *Turner* factors, a reasonableness test "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). The *Turner* factors are: "(1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether alternative means for exercising the right remain open to the prisoner; (3) the impact of the regulation on prison staff, other inmates, and the allocation of prison resources; and (4) the

availability of ready alternatives to the regulation." *Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996); *Turner*, 482 U.S. at 89-91.

While the rational-basis test applies to constitutional claim cases, strict scrutiny applies to claims brought under RLUIPA. The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, provides that no government shall impose a substantial burden on the religious exercises of an inmate, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1 (2007). A government regulation is a substantial burden when it significantly inhibits or constrains conduct or expression that manifests some central tenet of a person's individual religious beliefs, meaningfully curtails a person's ability to express adherence to a faith, or denies a person reasonable opportunities to engage in religious activities cardinal to a person's religion. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (brackets and citation omitted). Courts must "[a]ccord great deference to the judgment and expertise of prison officials, 'particularly with respect to decisions that implicate institutional security.'" *Murphy*, 372 F.3d at 983 (*quoting Goff v. Graves*, 362 F.3d 543, 549 (8th Cir. 2004)).

The court first notes that "the Muslim religion is a legitimate form of religion protected by the First Amendment, and the court finds that [El-Tabech is] sincere in [his] practice of and belief in that religion." *Rogers v. Scurr*, 676 F.2d 1211, 1212 (8th Cir. 1982). Turning first to El-Tabech's kosher diet request, at trial, defendants voiced reasons for denying a religious diet. Those reasons include the speculative increased cost of food and preparation materials, the potential for creating the perception of favoritism by other

4

inmates, and the risk of inviting increased religious diet requests. Applying the deferential *Turner* standard, the court finds that the defendant's denial of a kosher meal is not rationally related to its economic and administrative concerns. Defendants were unable to offer any evidence at trial to quantify the economic impact of accommodating prisoners a kosher meal or kosher items through the canteen. Moreover, the evidence demonstrates that defendants are able to furnish prisoners with kosher meals during Ramadan without incident or impact, and vegetarian, low sodium, cardiac, and bland diet options are provided to prisoners. According to the evidence adduced at trial, ready alternatives exist to satisfy El-Tabech's dietary requirements at a de minimis cost to the prison.

While deference is due to prison officials' expertise under both RLUIPA and the First Amendment, the evidence shows that defendants did not select the least restrictive means to achieve their goal. Indeed, the court finds it incredulous that at a minimum, prison officials are unable to contract with their canteen supplying vendor for a list of generally available kosher items so that list could be made available to prisoners purchasing kosher food. Therefore, the court finds that defendants violated El-Tabech's right to freedom of religion when they denied El-Tabech reasonable access to a kosher diet. The court does not find that a separate kosher kitchen is a necessary option to accommodate kosher diet requirements. However, the court orders the parties to negotiate the feasability of providing El-Tabech and other prisoners similarly situated with the following options:

    1.    Modifying the canteen sheet to indicate the kosher items;

    2.    Supplying inmates with prepackaged kosher meals;

>    3.   Supplying inmates with kosher food already available in the kitchen (*i.e.*, boiled eggs, unopened cans and jars, uncut and unpeeled fruits and vegetables, cereal, crackers, and liquid nutritional supplements).

The court further orders the parties to report back in sixty (60) days on which option or combination of options will be instituted by NDCS.

As to El-Tabech's prayer request, the court finds that posting a prayer schedule so that the guards are aware of it is not an unreasonable accommodation. The court orders that such a schedule should be posted with the understanding that the guards can adjust activities or reduce disturbances as appropriate. However, the court recognizes that prison security is a compelling state interest, and that altering prison schedules to accommodate El-Tabech's prayer schedule is not expected.

Furthermore, El-Tabech's request for daily showers is denied. Incarceration, by its nature, limits many privileges and rights, the further retraction of which is justified by attempts to escape from prison. El-Tabech is currently housed in AC where he receives three showers per week. General population prisoners, however, are permitted showers seven days a week. Prison officials testified at trial about the logistics and staff needed to run TSCI, and how accommodating a different shower schedule for an AC prisoner would disrupt the system, cause security concerns due to staffing requirements, and may even serve as a catalyst that ignites disputes or breeds resentment between inmates. As such, the court finds that a valid, rational connection exists between the fewer showers available to inmates housed in AC, and the compelling government interest in maintaining a safe, secure prison facility. The evidence shows that El-Tabech has a sink in his cell where he may wash himself, and this is a reasonable alternative for El-Tabech on the days he is not

permitted to shower. Further, El-Tabech may earn an additional shower each week as an incentive.

THEREFORE, IT IS ORDERED that

1. Judgment will be entered for the plaintiff against the defendants on plaintiff's amended complaint (Filing No. 110) as set forth herein;

2. The parties are ordered to submit their negotiation results to this court within sixty (60) days as set forth herein; and

3. Pursuant to Federal Rule of Civil Procedure 52, a separate judgment will be filed on this date in accordance with this Memorandum and Order.

DATED this 17th day of July, 2007.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge